Christos Laganas v. Commissioner. Christos Laganas and Arhontoula Laganas, Husband and Wife v. Commissioner.
Laganas v. Commissioner
Docket Nos. 57304, 57305.
United States Tax Court
T.C. Memo 1959-159; 1959 Tax Ct. Memo LEXIS 89; 18 T.C.M. (CCH) 689; T.C.M. (RIA) 59159; August 14, 1959
Timothy J. Driscoll, Esq., and George C. Eliades, Esq., for the petitioners. Frank V. Moran, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined deficiencies in income tax as follows: Petitioner
Year
Deficiency
Christos Laganas
1947
$10,337.43
Christos Laganas and
1948
6,034.38
Arhontoula Laganas]
1949
7,611.38
The issues to be decided are: (1) Whether Christos or Arhontoula Laganas is the grantor of the Laganas Realty Trust; and (2) whether the income of that trust for 1947 through 1949 is includible *90 in Christos Laganas' income for 1947 and in Christos and Arhontoula Laganas' income for 1948 and 1949. Findings of Fact The stipulated facts are found. Christos and Arhontoula Laganas, husband and wife, reside in Lowell, Massachusetts. Christos filed an individual income tax return for 1947, and he and Arhontoula filed joint income tax returns for 1948 and 1949, with the collector of internal revenue for the district of Massachusetts. During the years in issue, petitioners' children were Marie, Peter, Arthur and Constantine, who were born on June 28, 1927, December 25, 1928, May 20, 1931, and June 15, 1937, respectively. From 1947 through 1949, and for some time prior thereto, Christos engaged in manufacturing shoes, and conducted this business in a building located on Jackson Street, Lowell, Massachusetts, hereafter called the Jackson Street property. On November 30, 1946, Christos purchased the Jackson Street property from the Courier-Citizen Company, for $75,000. This amount was paid in part by a check for $30,000 drawn by Christos on a joint account which he and his wife had at the Middlesex County National Bank, hereafter called the Middlesex Bank. The remaining $45,000 *91 was paid with funds which Christos borrowed from the Middlesex Bank. The note covering this indebtedness was secured by a mortgage on the Jackson Street property and provided that Christos would pay $1,125 on January 1, 1947, and a like amount each 3 months thereafter. On November 30, 1946, Christos executed a trust agreement which reads in part as follows: "AGREEMENT OF TRUST "AN AGREEMENT and DECLARATION OF TRUST made * * * by Christos * * * Trustee of the 'LAGANAS REALTY TRUST', for the purpose * * * of acquiring real-property * * * and holding the same as a common or joint investment for the common and equal benefit of the shareholders * * *. "(1) * * * "(a) The Trustee under this agreement is Christos * * *; and any property conveyed, transferred or assigned to the Trustee or Trustees hereunder, or otherwise acquired hereunder shall be held by him as Trustee or Trustees under this agreement. "(2) The term 'Shareholder' used in this agreement shall mean holder of record of the * * * certificate of beneficial interest signed by the Trustee or Trustees. "(a) The Shareholders shall not have any interest in the Trust Property itself, real or personal, and shall have *92 no right to call for any partition of any realproperty or the distribution of any personal-property at any time held by the Trustee or Trustees hereunder, but the shares or certificates of beneficial interest shall be personal property. "(b) * * * [Certificates] of beneficial interest are not transferable on the books of the Trust. "(c) The death of a shareholder shall not operate to determine the Trust, nor shall it entitle the heirs or legal representative of the deceased shareholder to an accounting, or to bring or maintain any action in the Courts or otherwise against the Trust Property, or the Trustee or Trustees, but the heirs shall succeed to all the rights of the said deceased shareholder under this Trust upon the surrender of the * * * certificates of beneficial interest and the receipt of a new certificate or certificates. "The Trustee or Trustees, as such, shall have the right to purchase all or part of the shares from said heirs * * * of the deceased shareholder or from any shareholder if deemed to be beneficial for the remaining shareholders, whenever said shares are offered to them, at a price which said Trustee or Trustees may deem warranted and justified and *93 if said Trustee or Trustees shall fail to purchase said certificate or certificates, then a new certificate or certificates may be issued by said Trustee or Trustees to said heirs * * * and the holder thereof shall thereupon become subject to this agreement. "Issue of Shares "(3) The Trustees under this agreement shall as such have power to issue shares in such form as they shall deem best and for such cash, property, tangible or intangible, services, or expenses as may be determined from time to time by the Trustees, and such determination shall be conclusive as to the value of such shares. No certificate shall be issued for any fraction of a share. "(a) Any Trustee may acquire or hold shares in the Trust in his individual name and on his personal account, or jointly with others, or as a member of a firm, without being disqualified to act as Trustee and while so owning and holding such shares on his personal account shall be entitled to the same rights and privileges as any other shareholder. "* * * "General Power and Duties of Trustees "( 4) The Trustee or Trustees under this agreement shall have the sole legal title to all property, both real and personal, at any time *94 held, acquired, or received by them as Trustee or Trustees under the terms of this Agreement, or which the shareholders under this agreement shall have any beneficial interest as such shareholders, and they shall have and exercise the exclusive management and control of same, in any manner that they shall deem for the best interests of the shareholders, with all the rights and powers of absolute owners thereof. The Trustees may sell, exchange, partition, mortgage, pledge, lease, give options, make agreements to sell, or in any other way dispose of, or deal with both real and personal property of the Trust, or any part thereof, or interest therein, upon such terms as they see fit, and take in exchange therefor, cash securities, property, notes, and obligations of any kind or description; * * * may place any restrictions or encumbrances on said land either by agreement with their grantees or otherwise; for all purposes use any moneys and property on hand; and generally make all contracts upon such terms and conditions as they may agree upon with any person, partnership, corporation or association, and do all things deemed desirable, in the management, development and maintenance of the *95 Trust properties and deemed for the best interests of the shareholders. They may borrow on notes or bonds of the Trust, or otherwise, either without security, or secured by the pledge or mortgage with power of sale of the real or personal property, or assets of the Trust, as they deem best, such sums from time to time as they require, and shall have full power to execute all deeds, leases, mortgages, options and agreements or instruments in writing, and to do any other things which they shall deem proper for executing any of the powers or trust herein contained, subject only to the provisions and purposes of this agreement, and shall have full power to perform and fulfill all agreements and obligations and pay all liabilities properly assumed by them as such Trustees. "(4A) The Trustee or Trustees shall have full power and discretion as if absolute owner or owners to invest and reinvest the Trustee Fund, including any surplus and income in any way he or they may deem fit and proper and for whatever purpose or purposes the said Trustee or Trustees may decide. "* * * "(6) The Trustee shall have power to pay all the expenses of organization of this trust * * * and in acquisition *96 of property to be acquired hereunder: * * *. "(7) The Trustees shall have power to determine whether moneys or things shall * * * be considered as capital or income and what constitutes gross income and what net income in any year or half year, and to determine the mode in which any expenses or outgoing shall be borne as between capital and income. "(a) The Trustee (or Trustees) may declare dividends from the net income of the Trust Fund among the cestuis que trustent as when and in such amounts as he (or they) deem proper, and may distribute such portion of the surplus, in such amounts and at such times as he (or they) may deem proper. "(b) The Trustee (or Trustees) may set aside from time to time such portion of the net income, that has not been specially reserved or distributed in dividends as a surplus fund. "(c) The Trustee (or Trustees) may render an account annually or oftener, or less often if they may desire * * *. "* * * "NUMBER AND INCAPACITY OF TRUSTEES, AND VACANCIES "(9) The Trustees shall not be more than three in number at any one time. The concurrence of all the Trustees shall not be necessary to the validity of any action done by them, but the action *97 of a majority of the Trustees for the time being, shall be valid for all purposes. Any Trustee may resign * * *. Any vacancy in the number of Trustees may be filled by the remaining Trustee or Trustees by an instrument in writing * * *. "* * * "LIABILITY OF SHAREHOLDERS AND TRUSTEES "(13) Shareholders hereunder shall not be liable for any assessment, and the Trustees shall have no power to bind the shareholders personally. "* * * "(b) The Trustee or Trustees hereunder shall be only liable for his or their wilful acts hereunder. "(14) Every act done, power exercised, or obligation assumed by the Trustees, pursuant to the provisions of this agreement, or in carrying out the Trusts herein contained, shall be held to be done, exercised or assumed, as the case may be, by them as Trustees and not as individuals, * * *. "* * * "AMENDMENT OF AGREEMENT "( 17) This agreement and declaration may be amended or altered, except as regards the liability of the Trustees and shareholders by the Trustees for the time being, but no alteration or amendment shall affect any person not having actual notice thereof, until a certificate of such alteration or amendment has been recorded *98 * * *, nor shall any alteration or amendment, or other action affect previously acquired rights of any third person other than shareholders hereunder. "* * * "TERMINATION OF TRUST "(19) The trust under this agreement may be terminated at any time by the trustee for the time being. "(20) Unless the trusts under this agreement shall be sooner terminated, as hereinbefore provided, they shall continue for * * * 21 years after the death of the original trustees hereto, and at the expiration of the time so limited for such continuance of the said Trusts, they shall terminate. "(21) Upon the termination of the Trust under this Agreement by the expiration of time, or for any other cause, the Trustee shall liquidate the Trust property as he may deem for the best interests of the shareholders, and divide the net proceeds among the shareholders in proportion to their holdings. "(22) Christos Laganas aforesaid, herein named as Trustee hereby signifies his acceptance of the trust herein set forth." * * *
An addendum to this agreement reads: "I, Christos Laganas, Trustee of the 'LAGANAS REALTY TRUST', as aforesaid hereby certify that the following is a list of the beneficiaries *99 holding non-transferable shares issued November 30, 1946 in accordance with the terms of the foregoing trust. The total shares issued on said November 30, 1946 and to date amounts to * * * 200 non-transferable shares. * * * "Christos Laganas
20 shares
Arhontoula Laganas
20 shares
Mary [Marie] Laganas
40 shares*lPeter Laganas
40 shares
Athas [Arthur] Laganas
40 shares
Constantine Laganas
40 shares"
* * *
This addendum and the agreement were recorded on December 31, 1946. On November 30, 1946, Christos transferred to "Christos Laganas, as he is Trustee of the Laganas Realty Trust," the Jackson Street property, the transfer being subject to the $45,000 mortgage. Neither Christos nor Arhontoula filed a gift tax return in connection with this transfer. Christos remained trustee of the Laganas Realty Trust throughout the years in issue. On January 6, 1947, Christos, as trustee, appointed Arhontoula co-trustee of the Laganas Realty Trust. The income tax returns of the Laganas Realty Trust for 1947 and 1949 were executed by Christos and the return for 1948 was executed by Arhontoula. On each of these returns Christos was listed as the grantor of the *100 trust. On January 2, 1947, a checking account was opened at the Middlesex Bank in the name of the Laganas Realty Trust. Christos and Arhontoula signed the signature card for this account as trustees. Arhontoula opened an account at the First National Bank of Boston on some date subsequent to 1946, in which she deposited the dividends paid from the Laganas Realty Trust to herself and the minor beneficiaries. During the years in issue she also deposited personal funds in this account, which funds were intermingled with the dividends from the trust. On May 9, 1947, Arhontoula, as trustee, drew 6 checks totaling $5,780, on the account which the Laganas Realty Trust had with the Middlesex Bank. On March 1, 1948, Arhontoula, as trustee, drew 5 checks and Christos, as trustee, drew 1 check, all of which totaled $5,400, on the same account. Arhontoula, as trustee, drew 6 checks on the same account on June 8, 1948, and again on February 25, 1949, which totaled $5,400 and $7,500, respectively. The 6 checks which were drawn on May 9, 1947, March 1, 1948, June 8, 1948, and February 25, 1949, were payable to the 6 beneficiaries of the Laganas Realty Trust and the amounts paid were in proportion *101 to their interests as set forth in the addendum to the trust agreement. On September 30, 1949, Arhontoula drew 2 checks payable to herself and Christos, each in the amount of $750. On October 1, 1949, she drew a check payable to Marie in the amount of $1,500, and on December 30, 1949, she drew 3 checks each amounting to $1,500, payable to Peter, Arthur and Constantine. All of the checks drawn by Arhontoula with the exception of those payable to Christos and of 2 checks, each in the amount of $1,500 dated February 25, 1949, and October 1, 1949, which were payable to Marie, were deposited in Arhontoula's account with the First National Bank of Boston. On January 15, 1947, Christos executed an indenture of trust with Arhontoula as trustee for the benefit of Arhontoula and the 4 children, equally. On May 9, 1947, the Sun Life Assurance Company of Canada issued to "ARHONTOULA LAGANAS, TRUSTEE UNDER INDENTURE OF TRUST DATED JANUARY 15, 1947" as owner, a $100,000 insurance policy on the life of Christos. The annual premium for this policy was $5,200, and during the years in issue it was paid from those amounts in Arhontoula's account at the First National Bank of Boston which were received *102 from the Laganas Realty Trust. During the years 1947, 1948 and 1949, combined payments of principal and interest on the note executed in favor of the Middlesex Bank and secured by a mortgage on the Jackson Street property were $16,338.47, $5,368.11, and $5,478.39, respectively. All of the payments were made by checks drawn by Arhontoula as trustee on the Laganas Realty Trust's account at the Middlesex Bank, with the exception of $5,500 paid in 1947 by a check drawn by Arhontoula on her account at the First National Bank of Boston. By November 30, 1946, Arhontoula had earned and deposited in the joint account which she and her husband maintained in the Middlesex Bank, approximately $30,000 to $31,000. She and Christos visited their attorney for advice and he recommended the creation of a trust. Arhontoula was not in Lowell on November 30, 1946. On October 2, 1950, Christos, "[by] virtue and in execution of the special powers * * * vested in me as Trustee * * * under a Declaration of Trust made the 30th day of November, 1946" amended the terms of the Laganas Realty Trust to provide that "the trustee or trustees for the time being shall at no time act for their individual advantage. *103 They shall always act for the best interest and advantage of the shareholders and any act or acts of the trustee or trustees that may be in conflict with the interest or interests of the shareholders shall be resolved against the trustee or trustees. In acting as trustee or trustees, the trustees shall have no right to invest any of the principal, surplus or income in any business or venture that they or any of them have an interest in, and no trustee or trustees shall have the right to borrow any of the principal, surplus or income for his or their individual needs or benefits." On the same date Arhontoula resigned as trustee, Christos "as the remaining trustee" appointed Marie and Peter trustees, and Christos resigned as trustee. Christos is the grantor of the Laganas Realty Trust. Opinion Petitioners have undertaken a considerable burden in attempting to establish in accordance with an amendment to the pleadings at the hearing that petitioner-wife and not petitioner-husband was in reality the grantor of the trust in controversy. They are apparently undaunted by the facts that the husband ostensibly and solely executed the trust instrument, bought the building in which his *104 business was being conducted, executed as an individual the purchase money mortgage thereon, paid the balance out of cash in his (joint) bank account, himself conveyed the building to the trust, and only after an interval of more than a month, himself made his wife a co-trustee. The contention is that the bank account in question was a joint account of the husband and wife and that the wife had sufficient funds in it to have made the down payment, and in fact did so. But there is no showing that the husband's funds were not also adequate for the payment; to say nothing of the fact that the mortgage he alone executed amounted to more than half of the purchase price, and that even though the trust assumed the mortgage he continued to be potentially liable for the debt. Lynn Five Cents Sav. Bank v. Portnoy, 306 Mass. 436, 28 N.E. 2d 418 (1940). The advantages to petitioners of picturing the wife as grantor are obvious. In the first place, no deficiency has been determined against her for the first year in controversy; secondly, petitioners contend that no duty of support of the children rested upon her under local law, Gleason v. City of Boston, 144 Mass. 25, 10 N.E. 476 (1887); *105 and finally, the husband's use of the property as a place in which to conduct his business could not be attributed as a purpose to her if she were the grantor. But we think too many of the facts are at war with petitioners' contentions and that certainly petitioners have not borne their burden of proof in this respect. We have accordingly found as a fact that the husband was the grantor of the trust. The principal question is whether the income of the trust should be taxed to the grantor under either Helvering v. Clifford, 309 U.S. 331, or section 166, I.R.C. 1939. Respondent does not expressly rely upon section 167, I.R.C. 1939. As we said in Lillian R. Chertoff, 6 T.C. 266, 279, affd. (C.A. 6) 160 Fed. (2d) 691, "all the facts and circumstances * * * must be examined to determine whether or not there has been a real change in the economic position of the settlors. No one factor is determinative. It is the sum total of the different rights and powers that is important." Considering the ability of the grantor, at least with the concurrence of his wife, to create additional trust interests which could reduce, increase or virtually eliminate *106 [1] the interests of the beneficiaries other than his wife, Commissioner v. Buck, ( C.A. 2) 120 Fed. (2d) 775, reversing 41 B.T.A. 99; Warren H. Corning, 24 T.C. 907, affd. (C.A. 6) 239 Fed. (2d) 646; Ben F. Hopkins, 5 T.C. 803, affd. (C.A. 6) 157 Fed. (2d) 679, certiorari denied 331 U.S. 838; the broad and almost unrestricted powers of control expressly conferred upon the trustees, Louis Stockstrom, 3 T.C. 255, affirmed this issue (C.A. 8) 148 Fed. (2d) 491, certiorari denied 326 U.S. 719; the fact that the husband's business was the tenant of the sole asset of the trust, Frank G. Hoover, 42 B.T.A. 786; that the trust income might have been, and in fact probably was to some extent, used to defray the grantor's legal obligations [2] and to reduce indebtedness for which he was at least secondarily liable; and that all of the trust income was merely reallocated within the immediate family group of the grantor, Helvering v. Clifford, supra, we think it would be difficult to conclude that petitioner-husband could have actually considered *107 himself the poorer by reason of the creation of the trust. Nate S. Shapero, 8 T.C. 104, affd. (C.A. 6) 165 Fed. (2d) 811, certiorari denied 334 U.S. 844. Actually, this is an essentially stronger case for respondent than either Commissioner v. Buck, supra, or Stockstrom v. Commissioner, ( C.A. 8) 148 Fed. (2d) 491, certiorari denied 326 U.S. 719, because here, at least before the amendment of 1950, there was nothing to prevent the trustee-beneficiaries from greatly increasing their own shares at the expense, of course, of the other beneficiaries. And in such a case they would have no fiduciary obligation. Reinecke v. Smith, 289 U.S. 172; Welch v. Terhune, (C.A. 1) 126 Fed. (2d) 695, certiorari denied 317 U.S. 644. *108 While it may be true that the grantor's wife could have resisted, or at least refused to participate, in any revocation or amendment of the trust, [3] it is probable, as respondent suggests, that the dollar interests to which she would become entitled upon a revesting in the grantor could well have prevented this possibility from constituting an "adverse interest," Morris Joseloff, 8 T.C. 213. But in the view we have taken it is unnecessary to pass upon the applicability of section 166. It seems to us inescapable that the interest of the wife was not adverse to the creation of greater interests in herself and her husband at the expense of the shares designated for the children and certainly it would not interfere with the joint action of the trustees in increasing the share of one child at the expense of that of another. This ability to control the destination of the trust interests seems to us alone sufficient to require that the deficiency be approved under the broad principle of the Clifford case as it has been subsequently applied. Commissioner v. Buck, supra; Stockstrom v. Commissioner, supra.
*109 Decisions will be entered for the respondent. Footnotes
1. The beneficiaries of the trust as to both principal and income were not named in the instrument creating the trust. According to the document as set forth in our findings, those who were to participate, and the extent of their interests, were left to be designated at future times by the trustee or trustees. We see nothing to prevent this designation from being shifted from time to time in the future, at least by creating new shares in others, or increasing the shares of some at the necessary expense of those remaining. ↩
2. "Q. [By Respondent] You stated, Mrs. Laganas, you do not recall specifically whether any of these moneys [in the First National Bank of Boston] were used for college tuition? "* * * "A. I know that some of it, quite a bit of it or perhaps all of it, was my money because I put some of my money there, too."↩
3. It appears that in a subsequent year the grantor did in fact amend the trust without his wife's participation and that she thereupon resigned.↩